UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MATTHEW BEIN, *et al.*,<br><br>     *Plaintiffs*,<br><br>v.<br><br>THE ISLAMIC REPUBLIC OF IRAN,<br><br>     *Defendant*. | No. 21-cv-2160-JMC-MAU |

## REPORT AND RECOMMENDATION

This case arises from terrorist attacks that occurred between 2002 and 2011 in Afghanistan and Iraq. ECF No. 1 at 6–7.[1] Forty-seven Plaintiffs sued the Islamic Republic of Iran under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq.*, for injuries suffered in the attacks. *Id.* at 138–42. Nine Plaintiffs move for default judgment because Iran has failed to appear or otherwise defend. ECF Nos. 15, 38. The District Court referred Plaintiffs' Amended Motion for Default Judgment to this Court for a Report and Recommendation. Min. Order (Oct. 21, 2025). The Court recommends **GRANTING** Plaintiffs' Amended Motion.

## BACKGROUND

Plaintiffs allege that Iran provided material support to the terrorist organizations that executed the attacks that injured Plaintiffs. ECF No. 1 at 4–6. Plaintiffs are armed forces members, U.S. government employees, and family members or estates of those injured or killed in the attacks. *Id.* at 115–35. Under the FSIA service procedures, Plaintiffs attempted to serve Iran through Iran's Ministry of Foreign Affairs. ECF Nos. 6–7; *see* 28 U.S.C. § 1608(a)(3). Because that attempt failed, Plaintiffs served Iran through the U.S. Department of State as set forth

---

[1]     Citations are to the page numbers in the ECF headers.

1

in the FSIA. ECF Nos. 9–11; *see* § 1608(a)(4). The State Department served Iran on June 15, 2022. ECF No. 11. After Iran failed to respond within 60 days, the Clerk of this Court entered default against Iran. ECF Nos. 13, 15; *see* § 1608(d). Plaintiffs then moved for default judgment against Iran. ECF No. 38.

Plaintiffs Michelle Deuley, Justin Deuley, Jordan Deuley, Kathy Gibson, William Gibson, and Angela Jaeger are family members of two U.S. government contractors who were killed in a 2004 terrorist attack in Kabul, Afghanistan. ECF No. 1 ¶¶ 644–51, 659–66. Plaintiffs Ryan Kringle, Preston Cody Perkins, and Jay Murray are armed forces members who were injured in terrorist attacks in Afghanistan and Iraq. *Id.* at ¶¶ 691–94, 709–12, 721–27. Kringle was injured in a 2004 attack in Fallujah, Iraq. *Id.* at ¶¶ 691–94; ECF No. 38 at 31. Perkins was injured in a 2005 attack in Haditha, Iraq. ECF Nos. 1 at ¶¶ 721–27; 38 at 33. Murray was injured in a 2006 attack in Mehtar Lam, Afghanistan. ECF Nos. 1 at ¶¶ 709–12; 38 at 26.

## LEGAL STANDARD

Federal Rule of Civil Procedure 55(a) requires the clerk to enter a default against a defendant who "has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise." Fed. R. Civ. P. 55(a). If the plaintiffs' claim is not for a "sum certain," they "must apply to the court for a default judgment." Fed. R. Civ. P. 55(b). Under the FSIA, a court may enter default judgment against a foreign state when the plaintiff "establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). "Evidence is satisfactory when it supports each element of the claim upon which relief is sought and establishes a prima facie case that the claimant is entitled to relief." RESTATEMENT (FOURTH) OF FOREIGN RELATIONS LAW § 463 cmt. b (2018).

In FSIA terrorism cases, "firsthand evidence and eyewitness testimony is difficult or impossible to obtain from an absent and likely hostile sovereign." *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017) (citation modified), *vacated & remanded on other grounds sub nom.*, *Opati v. Republic of Sudan*, 590 U.S. 418 (2020). As such, the court has "the authority— indeed . . . the obligation—to adjust evidentiary requirements to differing situations." *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1048 (D.C. Cir. 2014) (citation modified). To that end, the court determines "how much and what kinds of evidence the plaintiff must provide" to satisfy the elements of default judgment under the FSIA. *Id.* at 1047; *see also Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010) (explaining that in FSIA cases, courts "look to numerous evidentiary sources," including "uncontroverted factual allegations . . . supported by documentary and affidavit evidence." (citation modified)). That said, a court need not "demand more or different evidence than it would ordinarily receive" because "the quantum and quality of evidence that might satisfy a court can be less than that normally required." *Owens*, 864 F.3d at 785.

The court also has "an unusual degree of discretion over evidentiary rulings in a FSIA case against a defaulting state sponsor of terrorism." *Id.* Indeed, the court does not "step into the shoes of the defaulting party and pursue every possible evidentiary challenge." *Id.* Even so, the court's findings of fact and conclusions of law must be supported by admissible evidence. *Id.* at 786; *see also* RESTATEMENT (FOURTH) OF FOREIGN RELATIONS LAW § 460 Rep. note 8 (2018) ("The court may not simply accept the plaintiff's unsupported allegations but must conduct further inquiry before entering judgment." (citation modified)). "Only where the court relies upon evidence that is both clearly inadmissible and essential to the outcome has it abused its discretion." *Owens*, 864

F.3d at 785–86 (citation modified).  "This is part of the risk a sovereign runs when it does not appear and alert the court to evidentiary problems."  *Id.* at 786.

## FINDINGS OF FACT

Plaintiffs support their Motion with expert testimony, affidavits, personal documents such as death certificates and marriage licenses, and news articles about the attacks.  ECF Nos. 38-1 to 38-10.  Plaintiffs ask the Court to qualify Michael Pregent, Dr. Michael Knights, and Dr. Patrick L. Clawson as experts.  ECF No. 38 at 18–20.  Plaintiffs also ask the Court to judicially notice expert evidence and materials submitted in prior FSIA cases.  *Id.* at 20–21.  The Court first addresses Plaintiffs' evidentiary requests before turning to the factual findings.

## I.    Plaintiffs' Evidentiary Requests

### A.    Expert Witnesses

The Court's "broad discretion [over evidentiary rulings in FSIA cases] extends to the admission of expert testimony."  *Owens*, 864 F.3d at 785.  "The testimony of expert witnesses is of crucial importance in terrorism cases . . . because firsthand evidence of terrorist activities is difficult, if not impossible, to obtain."  *Id.* at 787.  Indeed, "Congress originally enacted the terrorism exception in the FSIA because state sponsors of terrorism had become better at hiding their material support and misdeeds."  *Id.* at 788 (citation modified).  Courts "have repeatedly sustained jurisdiction or liability or both under the terrorism exception to the FSIA and in other terrorism cases based solely upon expert testimony."  *Id.*

Expert testimony is admissible when it "will help the trier of fact to understand the evidence or to determine a fact in issue," "is based on sufficient facts or data," "is the product of reliable principles and methods," and "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case."  Fed. R. Evid. 702.  "A properly qualified expert may base

4

his opinion upon otherwise inadmissible sources of information as long as those sources are reasonably relied upon in his field of expertise." *Owens*, 864 F.3d at 789 (citation modified); Fed. R. Evid. 703. But "a party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony." *Owens*, 864 F.3d at 789 (citation modified).

Plaintiffs first ask the Court to qualify Dr. Knights as an expert on "Iran's role in Iraq," Iran's "support for terrorist and militia groups in Iraq," and on terrorist groups operating in Iraq during the attacks in this case. ECF No. 38 at 18. Dr. Knights is a Senior Fellow at the Washington Institute for Near East Policy and previously spent six years as the head of intelligence for a private security company operating in Iraq. ECF No. 38-9 at ¶ 4. Dr. Knights also has 20 years of experience providing consulting services to U.S. government agencies on Iran and the Middle East. *Id.* at ¶ 6. Dr. Knights has published numerous books and articles on Iraq. *Id.* at ¶¶ 11, 12.

Second, Plaintiffs ask the Court to qualify Dr. Clawson as an expert on "Iran and its sponsorship of terrorist organizations." ECF No. 38 at 18. Dr. Clawson is a Research Counsellor at the Washington Institute for Near East Policy. ECF No. 38-10 at ¶ 3. Dr. Clawson authored multiple books on Iran and published more than 40 scholarly articles in prominent journals on the same topic. *Id.* at ¶¶ 9, 10. Dr. Clawson has also served as an expert witness on Iran in other FSIA cases. *See id.* at ¶¶ 5, 6.

Third, Plaintiffs ask the Court to qualify Pregent as an expert on Iran's "sponsorship of terrorist organizations" and "role in Afghanistan," and on terrorist groups operating in Afghanistan during the attacks in this case. ECF No. 38 at 18–19. Pregent is a former intelligence officer with more than 30 years of experience working on terrorism and security in the Middle East, North Africa, and Southwest Asia. ECF No. 38-8 at ¶ 1. Pregent is currently a Senior Fellow at the

Hudson Institute, serving as a Senior Middle East analyst. *Id.* at ¶ 14. Pregent has also served as an expert witness on Iran's material support of terrorism in other FSIA cases. *See id.* at ¶ 2.

After reviewing the experts' reports and qualifications, the Court finds each is qualified to opine on the proffered areas of expertise. *See Lee v. Islamic Republic of Iran*, 518 F. Supp. 3d 475, 482 (D.D.C. 2021) (qualifying Pregent as an expert on "intelligence matters, including attribution of terror attacks and evidence collection and analysis in the intelligence field" (citation modified)); *Hake v. Bank Markazi Jomhouri Islami Iran*, No. 17-cv-114, 2022 WL 4130837, at *5 n.5 (D.D.C. Sept. 12, 2022) (qualifying Dr. Clawson as expert on "Iran's economy and support of terrorist organizations" (citation modified)).

## B.     Judicial Notice

The court may "judicially notice a fact that is not subject to reasonable dispute" if it "is generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). The court "must take judicial notice if a party requests it and the court is supplied with the necessary information," but the court may "take judicial notice on its own." Fed. R. Evid. 201(c). "Because of the multiplicity of FSIA-related litigation in this jurisdiction, courts in this District have [ ] frequently taken judicial notice of earlier, related proceedings." *Rimkus*, 750 F. Supp. 2d at 171. Judicial notice, however, "is appropriate only if there is some particular indicia of indisputability." *Sibley v. Islamic Republic of Iran*, No. 23-cv-600, 2025 WL 1928036, at *15 (D.D.C. July 14, 2025) (citation modified). Moreover, "judicial notice is taken of facts, not documents." 21B Charles A. Wright, Arthur R. Miller, Kenneth W. Graham Jr., & Daniel D. Blinka, Federal Practice and Procedure § 5104 (2d ed. 1990).

6

Plaintiffs ask the Court to judicially notice several expert reports and testimony submitted in prior FSIA cases. ECF No. 38 at 20–21, 30–31, 36–37. Yet Plaintiffs neither identity what facts the Court should notice nor explain how those facts support their claims in this case. For example, although Plaintiffs ask the Court to notice Pregent's 191-page testimony in another FSIA case, they never point the Court to the specific facts that should be noticed or why those facts matter in *this* case. *See id.* at 30. Plaintiffs also fail to identify the evidence the Court should notice in expert reports submitted in prior FSIA cases. *See, e.g.*, *id.* at 30, 37. In any event, the Court is not a "pig[ ] hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). "It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." *Consol. Edison Co. of New York, Inc. v. FERC*, 510 F.3d 333, 340 (D.C. Cir. 2007). Accordingly, Plaintiffs' request to take judicial notice is denied.

## II.     Findings of Fact

The Court makes the following findings of fact based on the record evidence.

### A.     Iran's Material Support for Terrorism in Afghanistan

Iran has a long history of supporting terrorist groups, primarily through the Islamic Revolutionary Guard Corps and a branch of the Revolutionary Guard called the Quds Force. ECF No. 38-8 at 5–7. Other courts in this District have found that the Quds Force "is responsible to and directed by the Supreme Leader of Iran" and "trains, advises and logistically supports terrorist and insurgent movements, and performs related clandestine and covert special operation activities, on behalf of the Iranian government." *Roth v. Islamic Republic of Iran*, 651 F. Supp. 3d 65, 73–74 (D.D.C. 2023). Throughout the 1990s, the Quds Force helped train al-Qaeda operatives on building explosives to be used in Afghanistan. ECF No. 38-8 at 7–8, 7 n.11, 13 n.39 (ALIREZA

NADER ET AL., IRAN'S INFLUENCE IN AFGHANISTAN, RAND CORP. 8 (2014) (explaining that, in the 1990s, Iran "backed several Mujahideen groups fighting for control of Afghanistan")).

After the United States invaded Afghanistan in 2001, Iran sought to expand its influence in Afghanistan through a pragmatic approach of working with the U.S. government but also funding Afghan insurgents. *See* NADER, IRAN'S INFLUENCE IN AFGHANISTAN, at 9–16. Iran's pragmatic approach resulted from Iran's distaste of U.S. military presence in the Middle East and the United States and Iran's mutual interest in combating narcotics trafficking and protecting refugees. *Id.* For example, Iran helped fund reconstruction efforts in Afghanistan and worked with U.S. forces and Afghan law enforcement on anti-narcotics operations. ECF No. 38-3 at 105–06, 111. Meanwhile, in late 2001, the Quds Force provided sanctuary, funding, and weapons to al-Qaeda operatives fleeing from Afghanistan to help them rebuild. Adrian Levy & Cathy Scott-Clark, *Al-Qaeda Has Rebuilt Itself—With Iran's Help*, THE ATLANTIC (Nov. 11, 2017), https://www.theatlantic.com/international/archive/2017/11/al-qaeda-iran-cia/545576/ (last visited Mar. 20, 2026); ECF No. 38-8 at 8 n.12. The Treasury Department found that, since 2005, Iran has allowed a senior al-Qaeda operative to move "significant amounts of money via Iran for onward passage to [al-Qaeda's] leadership in Afghanistan and Iraq." *Treasury Targets Key Al-Qa'ida Funding and Support Network Using Iran as a Critical Transit Point*, U.S. DEP'T OF THE TREASURY (July 28, 2011), https://home.treasury.gov/news/press-releases/tg1261 (last visited Mar. 20, 2026); ECF No 38-8 at 8 n.14. Iran also provided al-Qaeda operatives with passports and other identification cards. ECF No 38-8 at 8 n.15.

In the early 2000s, Iran began supporting the Taliban in Afghanistan to combat U.S. forces even though Iran historically opposed the Taliban. *See id.* at 5 n.1, 13 n.39. The Quds Force and al-Qaeda trained the Taliban and provided it with "specialized expertise that enhanced the

Taliban's military capabilities." *Id.* at 9–10; *see also id.* at 10 n.20.  A 2009 State Department report on terrorism found that Iran's Quds Force provided "training to the Taliban in Afghanistan on small unit tactics, small arms, explosives, and indirect fire weapons." COUNTRY REPORTS ON TERRORISM 2009, U.S. DEP'T OF STATE 192 (Aug. 2010); ECF No. 38-8 at 10 n.23; *see also Owens*, 864 F.3d at 792 (concluding that the State Department's reports on terrorism are admissible under the public records exception to hearsay and help "bolster the experts' conclusions" and "independently show the plaintiffs' claims have some factual basis" (citation modified)).  The report also found that "since at least 2006, Iran has arranged arms shipments to select Taliban members, including small arms and associated ammunition, rocket propelled grenades, mortar rounds, 107mm rockets, and plastic explosives." COUNTRY REPORTS ON TERRORISM 2009.  Iran's Quds Force further trained Taliban fighters on vehicle-borne improvised explosive devices ("VBIED") and other complex attacks.  ECF No. 38-8 at 11–12.

Iran's support for al-Qaeda and the Taliban in Afghanistan coalesced in 2004 when al-Qaeda, the Taliban, and several other terrorist organizations formed the Kabul Attack Network ("KAN").  *Id.* at 16.  One of KAN's members, the Haqqani Network, typically planned and organized attacks while other members provided manpower.  *Id.* at 17.  The Taliban and al-Qaeda "became increasingly interwoven," as al-Qaeda passed money to the Taliban and leadership overlapped between the groups.  *Id.* at 16.  One court in this District found that "Iran's relationship with the Taliban and Haqqani Network began in earnest around 2000," with Iran providing Taliban leaders with "monetary support and individualized training to help build Taliban tactical and combat capabilities."  *M.M. v. Islamic Republic of Iran*, 708 F. Supp. 3d 22, 40 (D.D.C. 2023) (citation modified).

Finally, a 2004 State Department report on terrorism found that the Taliban regrouped in 2003 and that U.S. forces were combating al-Qaeda, the Taliban, and other insurgent groups. COUNTRY REPORTS ON TERRORISM 2004, U.S. DEP'T OF STATE 71 (Apr. 2005); ECF No. 38-8 at 16 n.46. The report also found that Iran was the "most active state sponsor of terrorism in 2004," that it "continued to exhort a variety of groups to use terrorism," and failed to control al-Qaeda members operating in Iran. COUNTRY REPORTS ON TERRORISM 2004 at 88.

**B.    Iran's Material Support for Terrorism in Iraq**

Courts in this District have thoroughly documented Iran's material support for terrorism in Iraq. *See, e.g.*, *Roth*, 651 F. Supp. 3d at 74–76; *Brown v. Islamic Republic of Iran*, 687 F. Supp. 3d 21, 33 (D.D.C. 2023) (finding that "after 2001, Iran increased its support" to terrorist organizations in Iraq). The court in *Roth* found that after U.S. forces overthrew Saddam Hussein in 2003, "Iran devoted considerable effort to pushing the United States out of [Iraq]" and provided an al-Qaeda leader "with funds and weapons, all while facilitating his safe passage into Iraq to fight the U.S. forces." *Roth*, 651 F. Supp. 3d at 74–75.

Plaintiffs' evidence reveals that terrorist organizations in Iraq used "Iranian-supplied [explosively formed penetrators (EFPs)] to conduct attacks in Iraq in the middle of 2004." COL. RICHARD KEMP & MAJOR CHRIS DRIVER-WILLIAMS, KILLING AMERICANS AND THEIR ALLIES: IRAN'S CONTINUING WAR AGAINST THE UNITED STATES AND THE WEST, JCFA at 9; ECF No. 38-8 at 5 n.1. Iranian factories produced roadside EFP bombs to be used in Iraq, and the rate of EFP use in Iraq grew by 150% in 2006. KEMP, KILLING AMERICANS AND THEIR ALLIES at 9–10. Iran sent the Quds Force "to train, guide, direct and motivate" Iraqi insurgent groups, and those groups used "sophisticated weapons, including lethal armor-piercing versions of [improvised explosive devices (IEDs)]." *Id.* at 8.

The 2004 State Department report on terrorism found that Iran was "providing funding, safe transit, and arms to insurgent elements" in Iraq. COUNTRY REPORTS ON TERRORISM 2004 at 89. Another State Department report from 2007 found that Iran "continued to provide lethal support . . . to some Iraqi militant groups." COUNTRY REPORTS ON TERRORISM 2007, U.S. DEP'T OF STATE 172–73 (Apr. 2008); ECF No. 38-8 at 11 n.25. The 2007 report explained that the Quds Force continued providing Iraqi militants with training and weapons, including sniper rifles, mortars, EFPs, and rockets. COUNTRY REPORTS ON TERRORISM 2007 at 173. The Iraqi militants trained by the Quds Force "passed on [their] training to additional militants inside Iraq, a 'train-the-trainer' program." *Id.*

Moreover, Iran provided sanctuary to al-Qaeda leaders, including one leader who eventually formed al-Qaeda in Iraq. *See* Levy, *Al-Qaeda Has Rebuilt Itself—With Iran's Help*; ECF No. 38-10 at 11–12; *Roth*, 651 F. Supp. 3d at 74–75. A report Dr. Clawson cited explains that, between 2003 and 2005, the Quds Force developed a widespread network in Iraq for training and arming terrorist groups. *See* KIMBERLY KAGAN, IRAN'S PROXY WAR AGAINST THE UNITED STATES AND THE IRAQI GOVERNMENT, THE IRAQ REPORT 6 (2007); ECF No. 38-10 at 15 n.7. Dr. Clawson cites another report illustrating how al-Qaeda leaders in Iraq wanted to "exploit a possible vacuum of power" and that some Iraqis thought of Iran and al-Qaeda as "the real occupiers in Iraq." NAJIM ABED AL-JABOURI & STERLING JENSEN, THE IRAQI AND AQI ROLES IN THE SUNNI AWAKENING, PRISM 2:1 6, 11 (2010); ECF No. 38-10 at 13 n.5.

According to Dr. Clawson, Iran supported the Ansar al-Islam insurgent group in Iraq, which in 2004 coordinated with al-Qaeda to conduct terrorist attacks on U.S. forces. ECF No. 38-10 at 14–16. Ansar al-Islam is an affiliate of al-Qaeda and is "armed with heavy machine guns, mortars, and antiaircraft weaponry. Jonathan Schanzer, *Ansar al-Islam: Iraq's al-Qaeda*

11

*Connection*, WASH. INST. NEAR E. POL'Y (Jan. 15, 2003); ECF No. 38-10 at 15 n.6.  Iran allows Ansar al-Islam "to operate along its borders," provides "goods and weapons" to the group, and lets Ansar al-Islam militants check cars passing into Iran.  *See* Schanzer, *Ansar al-Islam: Iraq's al-Qaeda Connection*.  Dr. Clawson quoted an intelligence report confirming that Iran trained Ansar al-Islam on building IEDs.  ECF No. 38-10 at 16.

### C.    The Attacks in Afghanistan

#### 1.    *August 29, 2004, Attack in Kabul*

John A. Deuley and Gerald "Jerry" W. Gibson worked for DynCorp International in Kabul under a contract with the U.S. Department of State.  ECF Nos. 38-3 at 2, 32–37; 38-4 at 4, 30.  Deuley and Gibson trained Afghan police and provided personal security to Afghan leaders.  ECF Nos. 38-3 at 2; 38-4 at 4.  On August 29, 2004, Deuley was outside DynCorp's headquarters in Kabul, preparing to drive a Four-Star General home.  ECF No. 38-3 at 5.  A vehicle bolted up a side road and exploded outside the headquarters, igniting more than 300 pounds of explosives.  *Id.* at 5, 63.  The blast destroyed the headquarters and killed Deuley, Gibson, and at least eight other people.  *Id.* at 5, 51, 62.

A Taliban spokesman claimed responsibility for the attack, and al-Qaeda released a statement claiming that it had worked with the Taliban "in placing a bomb in a vehicle and remotely detonating it in front of the American Center."  *Id.* at 60–61.  One news report described the attack as "carefully planned" and that "the bomb appeared to have been made by someone with a strong technical knowledge of explosives."  *Id.* at 43–44.  Pregent labeled the bomb as a VBIED.  ECF No. 38-8 ¶¶ 63, 74.

Deuley and Gibson's family members seek damages against Iran for this attack.  ECF No. 1 ¶¶ 644–51, 659–66, 781.  Plaintiff Michelle Deuley married John Deuley in September 1999.

ECF No. 38-3 at 3, 31. Their two kids are Plaintiffs Justin and Jordan Deuley. *Id.* at 4, 20, 26. Michelle, Justin, and Jordan were U.S. citizens when the attack occurred. *Id.* at 2, 20, 26. Michelle loved John "more than life itself," and "[t]he days, weeks, and months after his death were absolutely awful." *Id.* at 6–7. Michelle quit her job as a nurse to raise Justin and Jordan, and she started visiting a counselor. *Id.* at 8. Since John's death, Michelle relives "each moment of the day" John died "tormented by the firestorm of emotions." *Id.* at 9–10.

Justin was four years old when John died. *Id.* at 28. Justin remembers being John's "little fishing buddy" and playing outside with John. *Id.* at 27. Justin misses his dad's smile, and sadness taints the milestones in Justin's life because he "does not get to have [his] father there to celebrate with [him]." *Id.* at 28–29. Jordan was two years old when John died. *Id.* at 21. Jordan grew up "sad and ang[ry] because [John] hasn't been a part of [his] life." *Id.* at 22. He saw how John's death impacted Michelle and "can't help but cry with [Michelle]" when they discuss John. *Id.* at 22–23. Jordan grieves that he will never learn from or know his dad and that his dad will never meet Jordan's kids and fiancée. *Id.* at 23.

Plaintiffs Kathy Gibson, William Gibson, and Angela Jaeger were U.S. citizens when the attack occurred. ECF No. 38-4 at 4, 14, 20. Kathy married Jerry Gibson in March 1987. *Id.* at 5, 29. Kathy remembers Jerry as "loving and generous," "always put[ting] [her] first" and "help[ing] [her] achieve [her] goals." *Id.* at 6. After learning of Jerry's death, Kathy "was in shock" and "couldn't speak." *Id.* at 8. Kathy started a new job before the attack, but she quit "to grieve" and "never return[ed] back to work." *Id.* at 7, 9. "Certain days and events trigger" Kathy's "feelings of sadness, anger, frustration, and depression." *Id.* at 8. At special events, such as birthdays and holidays, Kathy sees only "an empty chair where [Jerry] should be sitting." *Id.* at 9. She has "tried to have other relationships, but none of them have worked out." *Id.* at 10.

13

Angela Jaeger is Jerry's daughter, and she was 34 years old when Jerry died.  *Id.* at 14–15.  Angela and her dad were close, and she remembers him taking her on family vacations.  *Id.* at 15.  When Angela learned of Jerry's death, her "brain just could not accept that he was gone."  *Id.* at 16.  She "miss[es] her dad every day" and misses "how special he made [her] feel [her] whole life."  *Id.*  William Gibson is Jerry's son, and he was 37 years old when Jerry died.  *Id.* at 20, 23.  William remembers Jerry "always [trying] to find time to provide fun experiences for [him] as a kid."  *Id.* at 21.  Jerry was William's hero.  *Id.* at 23.  August 29th remains "a somber day" for William, and he struggles with Jerry's decision to go to Afghanistan.  *Id.* at 25.  He has missed Jerry "every day since his death."  *Id.* at 26.

2.    *December 15, 2006, Attack in Mehtar Lam*

Plaintiff Jay Murray served as a Non-Commissioned Officer in the U.S. Army.  ECF No. 38-5 at 3.  On December 15, 2006, Murray was traveling in a five-vehicle convoy to Bagram to help locals build infrastructure.  *Id.*  From the side of the road, a large EFP struck the lead vehicle, penetrating and disabling the first two vehicles.  *Id.* at 3–4.  Murray was in the third vehicle; the blast launched him into the side of his vehicle, bursting his eardrum and knocking him unconscious.  *Id.* at 4.  Insurgents stormed the convoy with rocket-propelled grenades ("RPGs") and AK-47s.  *Id.* at 3.  The insurgents killed another servicemember during the ambush.  *Id.*  Murray was medevacked to Ramstein, Germany, where he was treated for his injuries.  *Id.* at 4.

Murray "suffered a concussion, tinnitus, and PTSD."  *Id.*  Murray has "trouble sleeping" and experiences depression, nightmares, flashbacks, and intrusive memories.  *Id.*  He also avoids crowds and "everything related to the military."  *Id.*  Murray "cannot enjoy fireworks."  *Id.*  As a result, Murray struggles to maintain relationships and jobs, leading to financial hardship.  *Id.*

14

### D.    The Attacks in Iraq

#### 1.    December 23, 2004, Attack in Fallujah

Ryan Kringle served in the U.S. Marine Corps and was stationed in Fallujah. ECF No. 38-6 at 2. On December 23, 2004, Kringle led a Marine squad to sweep Fallujah, looking for weapons, persons of interest, and intelligence on enemy combatants. *Id.* at 3. Kringle's squad was clearing a street when gunfire erupted nearby. *Id.* at 4. More than 25 high-value insurgents were firing on another Marine squad. *Id.* Kringle's squad ran to help, and Kringle scaled a building and started shooting the insurgents. *Id.* at 4–5. The insurgents, armed with RPGs and machine guns, killed three Marines. *Id.* at 5. Kringle "took shrapnel or a bullet" to his right leg. *Id.* After the Marines regrouped, air support bombed the insurgents. *Id.*

Kringle needed stitches to close his leg wound, and he "suffered hearing loss, tinnitus, and PTSD." *Id.* at 8. Kringle still has "night terrors and flashbacks" and is "constantly on high alert when . . . in public and around people." *Id.* at 9. He struggles to be in public places; his "head is always on a swivel." *Id.* Since the attack, Kringle's "outlook on life is muted and bleak." *Id.* He "no longer [has] interest in most things," causing him to "jump from job to job." *Id.* Kringle receives mental health screenings and counseling to help with the PTSD. *Id.* The Department of Veterans Affairs labeled him 100% disabled. *Id.* at 10.

#### 2.    November 16, 2005, Attack in Haditha

Preston Cody Perkins served in the U.S. Marine Corps as an Infantry Assaultman. ECF No. 38-7 at 2–3. On November 16, 2005, Perkins was conducting a "vehicle mounted patrol" between the Al Asad Air Base and Haditha Dam. *Id.* at 4. Perkins was in the "rear driver-side seat of the lead vehicle" heading to Haditha Dam. *Id.* Suddenly, an IED struck Perkins' vehicle. *Id.* The IED exploded, flipping the vehicle and hurling Perkins into the road. *Id.* at 4, 7. When

15

Perkins stopped tumbling, he tried crawling toward a rifle, "but couldn't move." *Id.* at 7. Perkins lost consciousness, and a Blackhawk helicopter medevacked him to a local base. *Id.* at 4. Another Marine was killed in the IED blast. *Id.* at 5.

Perkins broke his left hip, pelvis, multiple ribs, and other bones. *Id.* at 6. Colliding with the road also "caused extensive abrasions and lacerations." *Id.* Doctors screwed his hip back together; the "screws failed," so he needed two hip replacements. *Id.* at 6, 7–8. Perkins has PTSD and traumatic brain injuries, causing him headaches, memory loss, and cognitive functioning problems. *Id.* at 8. He is "in constant pain" and sometimes "can barely walk." *Id.* Although Perkins is close with his family, he "prefer[s] seclusion now" and does not have many close friends. *Id.* Perkins struggles with relationships, having twice divorced. *Id.*

## CONCLUSIONS OF LAW

Before entering default judgment against a foreign state, the Court must have subject matter jurisdiction and personal jurisdiction. 28 U.S.C. § 1330. The Court first addresses the jurisdictional questions before turning to liability and damages.

### I.    Subject Matter Jurisdiction Under the FSIA

The FSIA supplies "the sole basis for obtaining jurisdiction over a foreign state" in U.S. courts. *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989). Foreign states are "immune from the jurisdiction" of U.S. Courts unless the case falls within one of the FSIA's statutory exceptions. 28 U.S.C. § 1604. If an exception applies, this Court has "original jurisdiction." 28 U.S.C. § 1330(a). Accordingly, "at the threshold of every action in a district court against a foreign state, . . . the court must satisfy itself that one of the exceptions applies." *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493–94 (1983) (citation modified). Plaintiffs carry the burden to show that an exception applies. *Owens*, 864 F.3d at 784.

16

Plaintiffs assert jurisdiction under the FSIA's terrorism exception.  ECF No. 1 at 8.  That exception provides a cause of action to U.S. nationals, armed forces members, and U.S. government employees who have been injured or killed by a foreign state's sponsorship of terrorism.  28 U.S.C. § 1605A(c).  Under the terrorism exception, a foreign state is not immune when plaintiffs (1) seek "money damages . . . against a foreign state" (2) "for personal injury or death," (3) "that was caused by . . . the provision of material support or resources for" (4) an "extrajudicial killing," and (5) "an official, employee, or agent of such foreign state" provided the support "while acting within the scope of" their duties.  § 1605A(a)(1).  Relevant here, Plaintiffs must satisfy two other elements: (6) the foreign state must be "designated as a state sponsor of terrorism at the time the act"; and (7) "the claimant or the victim [must], at the time [of] the act," be a U.S. national, an armed forces member, or a U.S. government employee or contractor. § 1605A(a)(2)(A)(i)(1), (ii).

Plaintiffs have met their burden to establish jurisdiction under the terrorism exception. Plaintiffs satisfy elements one and two because they seek money damages against Iran (a foreign state) for deaths or injuries that Plaintiffs sustained in four terrorist attacks.  On element four, the FSIA defines an extrajudicial killing as "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples."  § 1605A(h)(7); 28 U.S.C. § 1350 note. "Attempted, but failed" extrajudicial killings are "not enough to confer jurisdiction under [§] 1605A." *Borochov v. Islamic Republic of Iran*, 94 F.4th 1053, 1061 (D.C. Cir. 2024).  Nor is it enough if only "the perpetrator died." *Id.* at 1062.  Here, an extrajudicial killing occurred in each of the four terrorist attacks.  Deuley and Gibson were killed in the 2004 Kabul attack.  An armed

17

service member was killed in the 2006 Mehtar Lam attack. Three Marines were killed in the 2004 Fallujah attack, and one Marine was killed in the 2005 Haditha attack.

Plaintiffs satisfy element five because Iran provided material support through the Quds Force, and Iran's Supreme Leader directs the Quds Force. For element six, the FSIA defines a state sponsor of terrorism as "a country the government of which the Secretary of State has determined . . . is a government that has repeatedly provided support for acts of international terrorism." § 1605A(h)(6). The U.S. Secretary of State designated Iran a state sponsor of terrorism in 1984, and the designation remains. *See State Sponsors of Terrorism*, U.S. DEP'T OF STATE, https://www.state.gov/state-sponsors-of-terrorism (last visited Mar. 24, 2026).

Plaintiffs also meet element seven. Plaintiffs Michelle Deuley, Justin Deuley, Jordan Deuley, Kathy Gibson, William Gibson, and Angela Jaeger qualify as claimants under § 1605A(a)(2)(A)(ii). *See Owens*, 864 F.3d at 805–07 (concluding that "the FSIA terrorism exception grants a court jurisdiction to hear a claim brought by a third-party claimant who is not the legal representative of a victim physically injured by a terrorist attack."). They also qualify as U.S. nationals because they were U.S. citizens at the time of the attack. *See* § 1605A(h)(5) (borrowing the definition in the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(22), defining a U.S. national as "a citizen of the United States"). Plaintiffs Murray, Kringle, and Perkins qualify as "victims" under § 1605A(a)(2)(A)(ii). *See Borochov*, 94 F.4th at 1060–61 (holding that an extrajudicial killing causes an injury under § 1605A only if the perpetrator killed someone in the attack).

The only remaining element Plaintiffs must satisfy is element three: causation. That is, Plaintiffs must show that Iran's material support to terrorist groups caused Plaintiffs' personal injuries or deaths. The FSIA requires proximate causation to establish jurisdiction. *Owens*, 864

18

F.3d at 794. Proximate causation exists when there is "some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered." PROSSER & KEETON ON THE LAW OF TORTS § 41, at 263 (5th ed. 1984). Plaintiffs establish a reasonable connection when "the defendant's actions [are] a substantial factor in the sequence of events that led to the plaintiff's injury," and "the plaintiff's injury [was] reasonably foreseeable or anticipated as a natural consequence of the defendant's conduct." *Owens*, 864 F.3d at 794 (citation modified).

But "the causal link between conduct and result [cannot be] so attenuated that the consequence [are] more aptly described as mere fortuity." *Paroline v. United States*, 572 U.S. 434, 445 (2014). That is because "every event has many causes . . . and only some of them are proximate." *Id.* at 444 (citation modified). Proximate causation thus "eliminates the bizarre." *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128 (D.C. Cir. 2004) (citation modified). Moreover, the FSIA does not require Plaintiffs to "prove exactly what happened . . . and when" because "direct evidence . . . almost always [is] unavailable." *Han Kim*, 774 F.3d at 1048. Plaintiffs, moreover, need not prove that Iran's material support went directly to the specific attacks causing their injuries. *Kilburn*, 376 F.3d at 1130; *Owens*, 864 F.3d at 799 (reasoning that "material support is fungible and terrorist organizations can hardly be counted on to keep careful bookkeeping records." (citation modified)).

The Court addresses Plaintiffs' causation argument for each attack.

### A.    2004 Attack in Kabul, Afghanistan

Plaintiffs argue that Iran's material support to the Taliban and al-Qaeda, who coordinated under the KAN, caused the 2004 attack in Kabul. ECF No. 38 at 21–26. Plaintiffs support their argument with documentary evidence and Pregent's expert report. *Id.* Pregent contends that the attack had the "specific hallmarks of Iranian material support," including lengthy planning,

19

sophisticated explosives, and the attack being targeted against the United States. ECF No. 38-8 at 19. Pregent reasons that this was a suicide attack, which is significant because "prior to Iranian training through al-Qaeda, the Taliban did not utilize suicide bombers." *Id.* at 20. Pregent cites a report explaining that, between 2001 and 2005, the Taliban began using suicide bombings in Afghanistan after al-Qaeda showed the tactic's effectiveness and that the Taliban began "facilitating Al-Qaeda's attacks." *Id.* at 20 n.65 (Brian Glyn Williams, *Suicide bombings in Afghanistan*, JIAA (Sep. 2007)). Pregent also notes that, even if this was not a suicide bombing, "the techniques, size, and scope of this terrorist attack represent a departure from what were previously seen from the Taliban" because of Iranian support. *Id.* at 21.

Plaintiffs' evidence establishes a reasonable connection between Iran's material support and the attack. First, Iran's material support was a substantial factor. The Taliban and al-Qaeda claimed responsibility for the attack. *See* ECF No. 38-3 at 60–61. An al-Qaeda spokesperson confirmed the group carried out the attack with help from the Taliban. *Id.* at 61. As the Court has already found, Iran provided extensive support to al-Qaeda and the Taliban during this time. Iran harbored al-Qaeda operatives in 2001 and allowed al-Qaeda to rebuild itself over the following years. By 2004, the Taliban and al-Qaeda became increasingly interwoven, passing money between themselves and sharing leadership personnel.

Moreover, through the Quds Force, Iran provided the Taliban with specialized expertise, enhancing the Taliban's capabilities. This included training on using VBIEDs, which was the type of bomb used to kill Deuley and Gibson. Plaintiffs' evidence further aligns with other courts' factual findings in FSIA cases. *See M.M.*, 708 F. Supp. 3d at 40 (finding that Iran began supporting the Taliban in 2000 and provided Taliban leaders with "monetary support and individualized training to help build Taliban tactical and combat capabilities" (citation modified)); *Selig v. Islamic*

20

*Republic of Iran*, 573 F. Supp. 3d 40, 53 (D.D.C. 2021) (finding that in 2001 Iranian intelligence officials met with a Taliban delegation, offering support sanctioned by Iran's Supreme Leader).

Second, Deuley and Gibson's deaths in a terrorist attack were reasonably foreseeable as a natural consequence of Iran's material support for terrorism. In 2004, Iran was the most active state sponsor of terrorism and exhorted insurgent groups to use terrorism. Iran also trained and financed al-Qaeda and the Taliban to carry out attacks in Afghanistan as part of Iran's pragmatic approach to expand its influence in Afghanistan. Given all of this, Plaintiffs have demonstrated causation for the 2004 attack in Kabul.

### B.    2006 Attack in Mehtar Lam, Afghanistan

Plaintiffs argue that Iran's material support to the Taliban caused the 2006 attack in Mehtar Lam. ECF No. 38 at 26–30. Plaintiffs support their argument with documentary evidence and Pregent's expert report. *Id.* During the attack, an EFP struck one of the vehicles in Murray's convoy, and insurgents stormed the convoy with RPGs and AK-47s. *Id.* at 27; ECF No. 38-5 at 3–4. Pregent ties this attack to the Taliban and Iran based on the attack method, complexity of the attack, and location. ECF No. 38-8 at 29.

On method, Pregent explains that Iran trained Taliban fighters on EFP use and "the tactic of disabling vehicles then attacking" as the troops assist those injured. *Id.* For complexity, Pregent describes the attack as "involv[ing] a command detonated EFP on a moving convoy, which indicates prior surveillance and substantial planning." *Id.* Further, the attack required expertise on EFP explosives and "intelligence on U.S. patrol patterns and overwatch of the attack site." *Id.* at 27. For location, Pregent states that, in 2006, the Taliban escalated attacks in Laghman Province, where Mehtar Lam is located. *Id.* at 26. A 2007 State Department report on terrorism found that "Taliban-led insurgency remained a capable, determined, and resilient threat to stability and to the

21

expansion of government authority, particularly in the Pashtun south and east." COUNTRY REPORTS ON TERRORISM 2007 at 133–34.

Plaintiffs' evidence establishes a reasonable connection between Iran's material support and the attack. Iran played a substantial factor in the attack because, as the Court found, throughout 2006, Iran shipped RPGs, rockets, explosive devices, and firearms to the Taliban. Both RPGs and AK-47s were used in this attack. Iran trained Taliban fighters on explosives and small unit tactics, enhancing the Taliban's military capabilities. The attack involved an EFP, indicating Iranian support because EFPs require technical expertise and sophisticated planning. *See also Roth*, 651 F. Supp. 3d at 90 (finding that EFPs are "a signature weapon of Iran" and EFP use in attacks usually satisfy proximate cause because EFPs "could not have been produced without Iranian expertise").

Moreover, Pregent's location evidence ties the Taliban to the Laghman Province, where the Taliban led the insurgency. *See also Cabrera v. Islamic Republic of Iran*, No. 18-cv-2065, 2022 WL 2817730, at *7, *14 (D.D.C. July 19, 2022) (finding that, in 2005, "the Taliban formed the Peshawar Shura to exert control over the northern and northeastern regions of Afghanistan— specifically in . . . Laghman" and that, by 2009, the Taliban was the dominant terrorist organization in Laghman Province). Murray's injuries in this attack were reasonably foreseeable given Iran supplied training and weapons to the Taliban for the Taliban to carry out attacks on U.S. forces. Plaintiffs thus demonstrate that Iran's material support caused the 2006 attack in Mehtar Lam.

### C. 2004 Attack in Fallujah, Iraq

Plaintiffs argue that Iran's material support to al-Qaeda caused the 2004 attack in Fallujah. ECF No. 38 at 31–33. Plaintiffs support their argument with documentary evidence and Dr.

Clawson and Dr. Knights' expert reports. *Id.* The attack occurred when insurgents, armed with RPGs and machine guns, fired on Kringle as he led a Marine squad on a weapons and intelligence sweep of Fallujah. ECF No. 38-6 at 3–5. Dr. Knights concludes that al-Qaeda committed this attack because al-Qaeda was the "predominant Sunni insurgent group[] active" in Fallujah in 2004 and "only Sunni terrorist/insurgent groups were active in December 2004." ECF No. 38-9 at 7. Dr. Knights states that the insurgents used Russian-made machine guns and RPGs in the attack, indicating an Iranian-supported al-Qaeda group. *Id.*

According to Dr. Knights, at this time, al-Qaeda was the only insurgent group "capable of organizing a group of this size and training with this weaponry." *Id.* at 8. Dr. Knights cites a report describing the history of the battle of Fallujah and explaining that, leading up to the battle, insurgent groups began "to coalesce around al[-]Qaeda leader Abu Musab al-Zarqawi," who took control of the city. GIAN GENTILE ET AL., REIMAGINING THE CHARACTER OF URBAN OPERATIONS FOR THE U.S. ARMY, RAND 71 (2017); ECF No. 38-9 at 8 n.1. Dr. Clawson summarizes Iran's support to terrorist groups in Iraq and traces the connection between Iran and al-Qaeda leader al-Zarqawi. ECF No. 38-10 at 11–12.

Before turning to causation, the Court notes defects in Dr. Knights' report. Dr. Knights states that he located the attack using a "geolocated attack report" and reached his conclusion that the attack location was in a Sunni-controlled area "based on [his] research." ECF No. 38-9 at 7. Because Dr. Knights provides neither the report nor his research, the Court cannot evaluate his opinions. *See* Fed. R. Evid. 702 (explaining that expert opinions must be "based on sufficient facts or data," be "the product of reliable principles and methods," and "reflect[] a reliable application of the principles and methods to the facts of the case"). Dr. Knights also states that the nature of the attack was "indicative of an Al-Qaeda in Iran group supplied and/or otherwise materially

23

supported by Iran."  ECF No. 38-9 at 7–8.  Dr. Knights again offers no explanation or evidence supporting that opinion.  *See* RESTATEMENT (FOURTH) OF FOREIGN RELATIONS LAW § 463 cmt. b (2018) ("Courts may accept uncontroverted evidence as true . . . but *they may not rely on conclusory allegations.*" (emphasis added)).

Despite the defects in Dr. Knights' report, Plaintiffs' evidence establishes a reasonable connection between Iran's material support and the attack.  As the Court's factual findings show, in 2004, Iran provided funding, transit, and arms to terrorist groups in Iraq.  During this time, the Quds Force supplied Iraqi militants with training and weapons, including sniper rifles, mortars, EFPs, and rockets.  The Iraqi militants, trained by the Quds Force, in turn trained other militant groups in Iraq.  The Quds Force also developed a broad network in Iraq to support terrorist groups.

Moreover, Iran provided sanctuary to al-Qaeda leaders to help them rebuild.  One of those leaders was al-Zarqawi, who formed al-Qaeda in Iraq.  *See* ECF Nos. 38-8 at 8 n.12 (Levy, *Al-Qaeda Has Rebuilt Itself—With Iran's Help*); 38-10 at 11–12.  One court in this District found that the Quds Force gave al-Zarqawi "funds and weapons, all while facilitating his safe passage into Iraq to fight the U.S. forces."  *Roth*, 651 F. Supp. 3d at 74.  Dr. Knights cites a report showing that, leading up to the battle of Fallujah, insurgent groups formed around al-Zarqawi, and al-Zarqawi's al-Qaeda controlled the city.  Another court in this District found credible that al-Qaeda "was the central insurgent force in the battle for Fallujah in 2004."  *Est. of Fishbeck v. Islamic Republic of Iran*, No. 18-cv-2248, 2023 WL 7448770, at *5 (D.D.C. Aug. 18, 2023) (citation modified).  Based on this evidence, Iran's material support was a substantial factor in this attack and Kringle's injuries were reasonably foreseeable.  Plaintiffs thus demonstrate that Iran's material support caused the 2004 attack in Fallujah.

24

**D.    2005 Attack in Haditha, Iraq**

Plaintiffs argue that Iran's material support to al-Qaeda caused the 2005 attack in Haditha. ECF No. 38 at 33–37.  Plaintiffs support their argument with documentary evidence and Dr. Clawson and Dr. Knights' expert reports.  *Id.*  This attack occurred when an IED exploded, flipping Perkins' vehicle and hurling Perkins into the road.  ECF No. 38-7 at 4–7.  Dr. Knights attributes the attack to al-Qaeda, but his analysis suffers the same defects as his analysis of the 2004 attack in Fallujah.  *See* ECF No. 38-9 at 10–11.  Because the Court does not find Dr. Knights' opinion credible, Plaintiffs fail to show that al-Qaeda committed this attack.

The Plaintiffs, however, need not prove that Iran's material support went directly to *this* attack.  *See Kilburn*, 376 F.3d at 1130 (rejecting the defendant's argument that "a state's material support must go directly for the specific act . . . that gives rise to the claim"); *Owens*, 864 F.3d at 798–99 (concluding that the FSIA's causation element does not require plaintiffs to show that the state knew or intended its support to cause a specific terrorist attacks).  Accordingly, although Plaintiffs cannot show al-Qaeda committed this attack, Plaintiffs' evidence still establishes a reasonable connection between Iran's material support and the attack.  The Court's factual findings explained that Iran sought to exploit a power vacuum in Iraq after Saddam Hussein's fall in 2003. To that end, Iran sent the Quds Force to Iraq to create a broad network that trained and directed Iraqi insurgent groups.  Iran also pumped massive amounts of weapons into Iraq, including EFPs, IEDs, and other sophisticated weapons.

Moreover, State Department reports from 2004 to 2007 consistently found that Iran armed and funded insurgent groups in Iraq.  Dr. Clawson showed that Iran's support extended beyond al-Qaeda to other insurgent groups, such as Ansar al-Islam.  As one court in this District found, Iran created routes "to smuggle weapons, ammunition, mortars, rockets, EFPs and IEDs from Iran into

Iraq." *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 49 (D.D.C. 2019). Indeed, Iran allowed Ansar al-Islam to operate on the Iranian-Iraqi border and check cars passing into Iran. Another court in this District concluded that al-Qaeda was the dominant insurgent group in Haditha after 2004 and that Iran's material support caused a 2005 attack in a town in the Haditha District. *Fishbeck*, 2023 WL 7448770, at *5; *see also Brown*, 687 F. Supp. 3d at 41–42 (concluding Iran caused several IED attacks in Iraq between 2004 and 2006 in part because "Iranian-backed training camps were vital to spreading knowledge about explosives in the years before these attacks"). Plaintiffs thus demonstrate that Iran's material support caused the 2005 attack in Haditha.

In sum, Plaintiffs provide satisfactory evidence to support that Iran's material support caused each of the attacks which injured Plaintiffs. Because Plaintiffs meet their modest burden, Plaintiffs have established that this Court has subject matter jurisdiction under the terrorism exception to the FSIA.

## II.    Personal Jurisdiction

Courts have personal jurisdiction over foreign states for "every claim for relief over which the district courts have [subject matter] jurisdiction . . . where service has been made under" the FSIA. 28 U.S.C. § 1330(b); *see* 28 U.S.C. § 1608(a). "In other words, under the FSIA, subject matter jurisdiction plus service of process equals personal jurisdiction." *GSS Grp. Ltd v. Nat'l Port Auth.*, 680 F.3d 805, 811 (D.C. Cir. 2012) (citation modified). No due process concerns exist by exercising personal jurisdiction over Iran because "foreign states are not 'persons' protected by the Fifth Amendment." *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 96 (D.C. Cir. 2002). Plaintiffs complied with the FSIA's service of process rules and properly served Iran. Accordingly, the Court may also exercise personal jurisdiction over Iran.

### III. Iran's Liability

Having established the Court's jurisdiction, the Court turns to whether Plaintiffs have proved their claims with satisfactory evidence. 28 U.S.C. § 1608(e). The FSIA's terrorism exception creates a private right of action against a foreign state sponsor of terrorism for "personal injury or death caused by" the foreign state's material support for extrajudicial killings. § 1605A(a), (c). Foreign states are liable to U.S. nationals, armed forces members, U.S. government employees, and legal representatives of those persons. § 1605A(c). The D.C. Circuit recently clarified that courts need not "search outside the statute" for substantive theories of liability because "the relevant law is the statute's plain text." *K.E.F.V. v. Islamic Republic of Iran*, 135 F.4th 988, 991 n.4 (D.C. Cir. 2025).

As discussed above, Plaintiffs established that Iran is a state sponsor of terrorism that caused the deaths or personal injuries of Plaintiffs by materially supporting terrorist groups in Afghanistan and Iraq. Plaintiffs also are U.S. nationals, armed forces members, or U.S. government employees. Plaintiffs' evidence is thus satisfactory to establish Iran's liability.

### IV. Damages

Plaintiffs that obtain a default judgment under the FSIA's terrorism exception may recover "economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c). Plaintiffs must prove "that the projected consequences are reasonably certain (i.e., more likely than not) to occur, and must prove the amount of damages by a reasonable estimate." *Fraenkel v. Islamic Republic of Iran, Ministry of Foreign Affs., et al.*, 892 F.3d 348, 353 (D.C. Cir. 2018) (citation modified); *Hill v. Republic of Iraq*, 328 F.3d 680, 684 (D.C. Cir. 2003). Courts "may rely on well-established statements of common law, . . . the Restatement of Torts, and other respected treatises, in determining damages." *Fraenkel*, 892 F.3d at 353. Plaintiffs Michelle

27

Deuley, Justin Deuley, Jordan Deuley, Kathy Gibson, William Gibson, and Angela Jaeger seek damages for loss of solatium. ECF Nos. 1 at 139–40; 38 at 40–45. Plaintiffs Ryan Kringle, Preston Cody Perkins, and Jay Murray seek pain and suffering damages. ECF Nos. 1 at 138–39; 38 at 45–49. All Plaintiffs seek punitive damages and post-judgment interest. ECF Nos. 1 at 138–40; 38 at 49–50.

### A.      Solatium Damages

To evaluate solatium damages, courts consider two factors: (1) the "injury to the feelings" of the family member; and (2) the loss of the victim's "comfort and society." *K.E.F.V.*, 135 F.4th at 992. Courts assess solatium damages using the framework for third-party intentional infliction of emotional distress ("IIED") claims. *See Fraenkel*, 892 F.3d at 357 (noting "a claim for solatium" is "nearly indistinguishable from a claim for intentional infliction of emotional distress" (citation modified)). To prove IIED, plaintiffs must show (1) extreme and outrageous conduct directed at a victim (2) that intentionally or recklessly caused severe emotional distress (3) to the victim's immediate family member.[2] *See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 78–79 (D.D.C. 2010) (citing RESTATEMENT (SECOND) OF TORTS § 46(2)(a) (A.L.I. 1965)). For element three, courts have "adopted the strict meaning of immediate family, defined as one's spouse, parents, siblings, and children." *Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54, 62 (D.D.C. 2018) (citation modified).

To calculate damages, courts follow the framework from *Estate of Heiser v. Islamic*

---

[2]      The Restatement (Second) of Torts states that a third-party plaintiff must also establish that she was present at the time of the extreme and outrageous conduct. *See* RESTATEMENT (SECOND) OF TORTS § 46(2)(a) (A.L.I. 1965). Courts, however, consistently find that third-party plaintiffs need not be present to prevail under the FSIA because acts of terrorism are extreme and outrageous. *See, e.g.*, *Est. of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 27–28 (D.D.C. 2009) (collecting cases and extending "suspension of the presence requirement to terrorism cases generally").

*Republic of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006).  *See Fraenkel*, 892 F.3d at 361.  That framework provides "baseline amounts[,] and [the court] may adjust upward or downward to account for individual circumstances."  *Barry v. Islamic Republic of Iran*, 437 F. Supp. 3d 15, 53 (D.D.C. 2020).  The baseline amounts for the family of a deceased victim are "$8 million for a spouse, $5 million for a child or parent, and $2.5 million for a sibling."  *Id.* at 53–54.

The court may adjust upward the damages amount for aggravating circumstances, "indicated by such things as testimony which describes a general feeling of permanent loss or change caused by decedent's absence or medical treatment for depression and related affective disorders."  *Id.* at 54 (citation modified).  Courts also consider, among other things, "how the claimant learned of [the] decedent's death," "whether there was an opportunity to say good-bye or view the body," and "the nature of the relationship between the claimant and the decedent."  *Fraenkel*, 892 F.3d at 357 (citation modified).  Though the *Heiser* framework is not mandatory, courts often apply it to provide similar awards to similar plaintiffs.  *See, e.g.*, *Kar v. Islamic Republic of Iran*, Nos. 19-cv-2070, 19-cv-2602, 2022 WL 4598671, at *18–19 (D.D.C. Sep. 30, 2022).

Plaintiffs Michelle Deuley and Kathy Gibson each seek $10,000,000 in solatium damages, based on the $8 million baseline for spouses of deceased victims and a 25% adjustment for aggravating circumstances.  ECF No. 38-2.  Their husbands were killed in the 2004 attack in Kabul, Afghanistan.  ECF Nos. 38-3 at 3, 31; 38-4 at 5, 29.  Through her affidavit, Deuley states that she loved her husband "more than life itself," and "[t]he days, weeks, and months after his death were absolutely awful."  ECF No. 38-3 at 6–7.  She quit her job as a nurse to raise their children, and she started visiting a counselor.  *Id.* at 8.  Since her husband's death, Deuley relives "each moment of the day" he died—"tormented by the firestorm of emotions."  *Id.* at 9–10.

Gibson has attested to the fact that she remembers her husband as "loving and generous," "always put[ting] [her] first" and "help[ing] [her] achieve [her] goals." ECF No. 38-4 at 6. After learning of her husband's death, Gibson "was in shock" and "couldn't speak." *Id.* at 8. Gibson started a new job before the attack, but she quit "to grieve" and "never return[ed] back to work." *Id.* at 7, 9. "Certain days and events trigger" Gibson's "feelings of sadness, anger, frustration, and depression." *Id.* at 8. At special events, such as birthdays and holidays, Gibson sees only "an empty chair where [Jerry] should be sitting." *Id.* at 9. She has "tried to have other relationships, but none of them have worked out." *Id.* at 10. The Court recommends awarding Michelle and Kathy each $10,000,000 in solatium damages. *Cf. Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 118 (D.D.C. 2015) (adjusting upward 25% for aggravating circumstances); *Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 83 (D.D.C. 2011) (same).

Plaintiffs Justin Deuley, Jordan Deuley, William Gibson, and Angela Jaeger each seek $6,250,00 in solatium damages, based on the $5 million baseline for children of deceased victims and a 25% adjustment for aggravating circumstances. ECF No. 38-2. Justin and Jordan are John Deuley's children, and William and Angela are Jerry Gibson's children. *Id.* Justin was four years old when John died. ECF No. 38-3 at 28. Justin remembers being John's "little fishing buddy" and playing outside with John. *Id.* at 27. Justin misses his dad's smile, and sadness taints the milestones in Justin's life because he "does not get to have [his] father there to celebrate with [him]." *Id.* at 28–29. Jordan was two years old when John died. *Id.* at 21. Jordan grew up "sad and ang[ry] because [John] hasn't been a part of [his] life." *Id.* at 22. He saw how John's death impacted Michelle and "can't help but cry with [Michelle]" when they discuss John. *Id.* at 22–23. Jordan grieves that he will never learn from or know his dad and that his dad will never meet Jordan's kids and fiancée. *Id.* at 23.

30

Angela Jaeger is Jerry's daughter, and she was 34 years old when Jerry died.  ECF No. 38-4 at 14–15.  Angela and her dad were close, and she remembers him taking her on family vacations.  *Id.* at 15.  When Angela learned of Jerry's death, her "brain just could not accept that he was gone."  *Id.* at 16.  She "miss[es] her dad every day" and misses "how special he made [her] feel [her] whole life."  *Id.*  William Gibson is Jerry's son, and he was 37 years old when Jerry died.  *Id.* at 20, 23.  William remembers Jerry "always [trying] to find time to provide fun experiences for [him] as a kid."  *Id.* at 21.  Jerry was William's hero.  *Id.* at 23.  August 29th remains "a somber day" for William, and he struggles with Jerry's decision to go to Afghanistan.  *Id.* at 25.  He has missed Jerry "every day since his death."  *Id.* at 26.  Based on their aggravating circumstances, the Court recommends awarding Justin, Jordan, William, and Angela each a $6,250,000 damages award.

### B.      Pain and Suffering Damages

Courts begin with a baseline assumption that claimants directly injured and "suffering substantial injuries in terrorist attacks are entitled to $5 million in compensatory damages." *Barry*, 437 F. Supp. 3d at 53.  In cases of severe physical and psychological pain, "an upward adjustment to the $7 to $12 million range may be appropriate." *Id.*  Courts also use "the VA disability rating" as "an objective metric" "for determining the relative degree of injury suffered by each service member." *Schooley v. Islamic Republic of Iran*, No. 17-cv-1376, 2019 WL 2717888, at *74 (D.D.C. June 27, 2019).  "The VA disability rating constitutes a specialized agency's official determination regarding the extent of disabling injury sustained by service members in connection with military service." *Id.*  Under the VA disability rating, servicemembers who are rated by the "VA up to 30% disabled receive a baseline award of $5,000,000; plaintiffs rated 40–60% disabled by the VA will receive an upward departure, for a total award of $6,000,000; and servicemember plaintiffs rated 70–100% disabled by the VA will receive a further upward departure, for a total of

31

$7,000,000." *Gration v. Islamic Republic of Iran*, No. 21-cv-1859, 2023 WL 5221955, at *30 (D.D.C. Aug. 15, 2023).

Plaintiff Jay Murray seeks $6,000,000 in pain and suffering damages for injuries sustained in the 2006 attack in Mehtar Lam, Afghanistan.  ECF No. 38-2.  Murray served as a Non-Commissioned Officer in the U.S. Army.  ECF No. 38-5 at 3.  From the attack, Murray "suffered a concussion, tinnitus, and PTSD."  *Id.* at 4.  Murray has "trouble sleeping" and experiences depression, nightmares, flashbacks, and intrusive memories.  *Id.*  He also avoids crowds and "everything related to the military." *Id.*  Murray "cannot enjoy fireworks." *Id.*  As a result, Murray struggles to maintain relationships and jobs, leading to financial hardship.  *Id.*  Murray has a VA Disability Rating of 70% for PTSD and 10% for tinnitus.  *Id.* at 5, 7–9, 11–36.  The Court recommends awarding Murray a $6,000,000 damages award.

Plaintiff Ryan Kringle seeks $6,000,000 in pain and suffering damages for injuries sustained in the 2004 attack in Fallujah, Iraq.  ECF No. 38-2.  Kringle served in the U.S. Marine Corps.  ECF No. 38-6 at 2.  In the attack, Kringle "took shrapnel or a bullet" to his right leg.  *Id.* at 5.  Kringle needed stitches to close his leg wound, and he "suffered hearing loss, tinnitus, and PTSD."  *Id.* at 8.  Kringle still has "night terrors and flashbacks" and is "constantly on high alert when . . . in public and around people." *Id.* at 9.  He struggles to be in public places; his "head is always on a swivel." *Id.*  Since the attack, Kringle's "outlook on life is muted and bleak." *Id.*  He "no longer [has] interest in most things," causing him to "jump from job to job." *Id.*  Kringle receives mental health screenings and counseling to help with the PTSD. *Id.*  The VA labeled him 100% disabled for PTSD and 10% disabled for tinnitus. *Id.* at 10.  The Court recommends awarding Kringle a $6,000,000 damages award.

Plaintiff Preston Cody Perkins seeks $7,000,000 in pain and suffering damages for injuries sustained in the 2005 attack in Haditha, Iraq.  ECF No. 38-2.  Perkins served in the U.S. Marine Corps as an Infantry Assaultman.  ECF No. 38-7 at 2–3.  Perkins broke his left hip, pelvis, multiple ribs, and other bones in the attack.  *Id.* at 6.  Colliding with the road also "caused extensive abrasions and lacerations."  *Id.*  Doctors screwed his hip back together, but the "screws failed," so he needed two hip replacements.  *Id.* at 6, 7–8.  Perkins has PTSD and traumatic brain injuries, causing him headaches, memory loss, and cognitive functioning problems.  *Id.* at 8.  He is "in constant pain" and sometimes "can barely walk."  *Id.*  Though Perkins is close with his family, he "prefer[s] seclusion now" and does not have many close friends.  *Id.*  Perkins struggles with relationships, having twice divorced.  *Id.*  The VA labeled him 100% disabled, and his disability ratings for each attack-related injury totaled 330% disabled.  *Id.* at 9–10.  The Court recommends awarding Perkins a $7,000,000 damages award.

### C.    Punitive Damages

The purpose of punitive damages is to punish and deter outrageous conduct.  *See Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 166 (D.D.C. 2017) (citing RESTATEMENT (SECOND) OF TORTS § 908(1) (A.L.I. 1965)).  Courts consider various factors in determining whether to award punitive damages: "(1) the character of the defendant's act, (2) the nature and extent of harm to the plaintiffs that defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants."  *Flanagan*, 87 F. Supp. 3d at 119 (citation modified).  When a defendant provides material support to terrorist organizations, courts find these factors satisfied.  *See, e.g.*, *id.* at 119–127; *Baker*, 775 F. Supp. 2d at 85 (awarding punitive damages based in part because "defendants supported, protected, harbored, aided, abetted, enabled,

sponsored, conspired with, and subsidized a known terrorist organization whose modus operandi included the targeting, brutalization, and murder of American citizens and others.").

Courts in this District use the multiplier approach to calculate punitive damages "when the defendants did not directly carry out the attack, but funded a proxy actor, and it is doubtful whether a large amount would have the deterrent effect that it might have had in times past." *Ben-Yishai v. Syrian Arab Republic*, 642 F. Supp. 3d 110, 134 (D.D.C. 2022) (citation modified). Under this approach, courts "multiply[] the total compensatory damages award by a factor of between one and five." *Id.*; *Roth*, 2018 WL 4680270, at \*16.

Here, Plaintiffs are entitled to punitive damages. Iran's acts are heinous and caused extensive harm. Iran supported multiple terrorist groups who sought to wreak violence on U.S. forces. Punitive damages support the need to deter Iran from continuing to commit terrorist attacks and supporting terrorist groups. Finally, Iran's GDP is around $375 billion. *See Iran*, INT'L MONETARY FUND, https://www.imf.org/external/datamapper/profile/IRN (last visited Mar. 2026). Plaintiffs seek punitive damages in the amount of three times their compensatory damages award. ECF No. 38-2. The Court concludes that Plaintiffs are entitled to punitive damages in this amount, to be apportioned according to each Plaintiffs' share of compensatory damages. Therefore, the Court recommends awarding Michelle Deuley and Kathy Gibson $30,000,000 each; Jordan and Justin Deuley, Angela Jaeger, and William Gibson $18,750,000 each; Murray and Kringle $18,000,000 each; and Perkins $21,000,000.

### D.    Post-Judgment Interest

Courts must allow interest "on any money judgment in a civil case recovered in a district court." 28 U.S.C § 1961(a). The interest is "calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the

34

Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." *Id.* Applying § 1961(a) is mandatory, not discretionary. *Gration*, 2023 WL 5221955, at *37. The Court recommends that the District Court award Plaintiff post-judgment interest under § 1961(a) in the Court's final order.

## CONCLUSION

For the foregoing reasons, the Court recommends **GRANTING** Plaintiffs' Amended Motion for Default Judgment and issuing damages awards as follows:

- Michelle Deuley: $10,000,000 in solatium damages and $30,000,000 in punitive damages;

- Kathy Gibson: $10,000,000 in solatium damages and $30,000,000 in punitive damages;

- Justin Deuley: $6,250,000 in solatium damages and $18,750,000 in punitive damages;

- Jordan Deuley: $6,250,000 in solatium damages and $18,750,000 in punitive damages;

- William Gibson: $6,250,000 in solatium damages and $18,750,000 in punitive damages;

- Angela Jaegar: $6,250,000 in solatium damages and $18,750,000 in punitive damages;

- Ryan Kringle: $6,000,000 pain and suffering damages and $18,000,000 in punitive damages;

- Jay Murray: $6,000,000 pain and suffering damages and $18,000,000 in punitive damages;

- Preston Cody Perkins: $7,000,000 pain and suffering damages and $21,000,000 in punitive damages; and

- Post-judgment interest as of the date of entry of judgment.

**SO ORDERED**.

Date:   March 24, 2026

_____
MOXILA A. UPADHYAYA
UNITED STATES MAGISTRATE JUDGE

35

**<u>Local Civil Rule 72.3(b) Notice</u>**

The Parties are advised that under the provisions of Local Rule 72.3(b), any Party who objects to a Report and Recommendation must file a written objection with the Clerk of Court within fourteen days of the party's receipt of the Report and Recommendation.  The written objections must specifically identify the portion of the report or recommendation to which objection is made and the basis for such objections.  Failure to file timely objections to the findings and recommendations set forth in this Report may waive that party's right of appeal from an order of the District Court that adopts such findings and recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985).

* * *